Mr. Justice Swayke
delivered the opinion of the court:
Hall filed his petition in the Court of Claims.
By leave of the court Benjamin Eoach filed a petition of inter-pleader. Subsequently Eoach died, and his executrix was made a party. Both parties are pursuing the proceeds of the same cotton. The cotton was raised, ginned, and baled on Eoach’s plantation, known as Bachelor’s Bend, in the State of Mississippi. About the 17th of April, 1863, it was seized by Lieutenant Barlow, of the United States Army, and subsequently converted into money, and the proceeds paid into the Treasury of the United States. About these facts there is no controversy. It is admitted that the cotton belonged originally to Eoach. It is clear, therefore, thattheclaim on behalf of' his estate must prevail, unless Hall, the adverse claimant, has shown a better title. Hence it is unnecessary to remark further in regard to the title asserted by the executrix. The United States have no interest in the controversy. The Government is merely a fund-holder for the benefit of the one of the two other parties who shall sue- *213 ceed in this litigation. The controversy turns upon the claim of Hall, and our remarks will be confined to that subject.
In considering the case in this aspect we must look to the findings of the court, and we cannot look beyond them. The court says “the evidence is not only voluminous but exceedingly conflicting, and much of it wholly irreconcilable.”
The findings as to this part of the case are as follows :
Hall is a man of color, of Indian and African descent, and claims to have been free-born. His mother was of Indian extraction, residing at the time of his birth in the city of Alexandria, as a free woman.
“8. Hall, with other slaves, was taken from a slave-market in “Washington, D. C., by one Thomas Williams, to New Orleans, La., and there he, with other slaves, was sold by a trader to the claimant Roach’s father, who sent him up to the Bachelor’s Bend plantation, in Mississippi. Hall was sent to the plantation in 1844, and remained there as the slave of Roach’s father until his death, in 1847, and after that as the slave of the claimant, Roach, who succeeded to the estate of his father, and remained there until after the cotton in question was seized, in 1863. He was treated all the time as a slave, fed and clothed by Ms master, and worked with the other slaves, sometimes as a field-hand and at others as a stock-minder.
“9. On the contrary, Hall now claims to have been a free man while living with claimant Roach, and that, as such, Roach was justly indebted to him on account of stock, hogs, pork, &c., which he had raised on Roach’s plantation, and sold and delivered to him, and that the cotton now in suit was given him by Roach in discharge of his indebtedness.
“ 10. Hall, under this claim of title, followed the cotton after its seizure to the river, and made affidavit that he was the lawful owner thereof. Roach’s overseer, McDowell, hearing of Hall’s claim to the cotton, immediately contested his right to it before the officers of the United States having it in charge; and Hall afterward admitted to McDowell, the overseer, that the cotton was not his, and that his oath, in which he asserted a claim thereto, was false.
“Afterward, however, Hall continued to prosecute his efforts to obtain the release of the cotton, and finally brought suit to recover the proceeds in this court.
“I. On the foregoing facts the court holds as conclusions of *214 law that, under the laws of the State of Mississippi, the claimant Hall, in his condition of servitude, could not lawfully contract with his master, or hold the property he claims to have given in consideration of the cotton, and that no title to it was ever vested in Hall.,; .
It is one of the findings of fact that Hall admitted that he had no title to the cotton, and that he had perjured himseif in swearing that he had such title, and the finding is without explanation or qualification. This would seem, under the circumstances, to have rendered it unnecessary further to consider the case. But the court placed its judgment upon the conclusion of law that Hall, being a slave, could not contract. There is no finding of facts as to the making of the alleged contract. Perhaps the reason was that conceding the facts to be as claimed by Hall, still the court was of opinion that his having been then a slave was fatal to his claim. If such were the law the facts were immaterial, for whatever they were they could not avail him. As the record stands this is the controlling point in the ease. We have examined the subject with care, and think the court came to the proper conclusion.
In order to see the proposition in its true light, it is necessary as it were to roll back the tide of time and to imagine ourselves in the presence of the circumstances by which the parties were surrounded when and where the contract is said to have been made. Slavery then existed in Mississippi, and her laws upon the subject were as they had been for years. Hall was brought to the State and there sold, bought, held, and treated as a slave. He belonged ostensibly for years to the father of Roach, the claimant, and upon the death of the father the son succeeded to the father’s rights. Hall held the same relations to the latter which he had held to the former. In this respect there was no change. His color was presumptive proof of bondage. The law of the State provided a way in which he could establish his freedom. He could assert his claim in no other way. The remedy was exclusive. Until he had vindicated Ms right to freedom in the mode prescribed the law regarded him as a slave, and it would not allow the question to be collaterally raised in his behalf by himself or any one else in any other proceeding. (Rev. Code of Miss, of 1857, c. 33, § 3, arts. 10,11, pp. 236,237; Thornton v. Demoss, 5, Smedes & Marshall, 618; Randal v. The State, 4 Id., 349; Peters v. Van Lear, *215 4 Gill, 249; Queen v. Neale, 3 H. & J., 158; Peters v. Hargrave, 5 Gratt., 14.)
It was an inflexible rule of the law of African slavery wherever it existed that the slave was incapable of entering into any contract, not excepting the contract of marriage. (Stephens on West Ind. Slavery, 58; Hall v. Mullen, 5 Har. &. J., 190; Gregg v. Thompson, 2 Rep. Con. N. S. C., 331; Jenkins v. Brown, 6 Humph., 299; Jackson v. Lewey, 5 Cowan, 397; Emmerson v. Howland, 1 Mason, 51; Bland v. Dowling, 9 Gill. & J., 27.)
This regulation was harsher than that which obtained in regard to the Eoman bondman, the Saxon villein, Eussian serf, and the German and Polish slave. (Cobb on Slavery, § 266.)
In the light of these authorities it is clear that if Hall did contract with Eoach as he alleges he did, the contract was an utter nullity. In the view of the law it created no obligation and conferred no rights as to either of the parties. It was as if it were not. This case must be determined as if slavery had not been abolished in Mississippi, and the laws referred to were still in force there. The destruction of the institution can have no effect upon the prior rights here in question.
In Osborne v. Nicholson (13 Wall., 654) this court held, upon the fullest consideration, that where a note sued upon was given for the purchase-money of slaves subsequently emancipated by the National Government, the plaintiff was entitled to recover.'
The Court of Claims adjudged correctly in deciding against Hall upon the ground we have considered, and also in deciding in favor of the executrix of Eoach.
The judgments of the Court of Claims are affirmed.