## COOK *et al.* v. CHILDS *et al.*

No. 3354.   Opinion Filed July 13, 1915.

Rehearing Denied October 19, 1915.

(152 Pac. 88.)

**INDIANS—Allotment—Dower.** The surviving widow of a deceased member of the Choctaw Tribe of Indians who died after his enrollment was finally approved, and before selecting his allotment, where an allotment was afterwards selected in his name by an administrator, and patent issued therefor under the provisions of section 22 of the act of Congress, July 1, 1902, commonly known as the "Choctaw, Chickasaw Supplemental Agreement," is entitled to dower in the lands selected by such administrator.

(Syllabus by the Court.)

*Error from District Court, Garvin County;
R. McMillan, Judge.*

Action by Ellen Cook and another against F. H. Childs, guardian of Newton Nelson Childs, and others. Judgment for defendants, and plaintiffs bring error. Reversed and remanded, with directions.

*Patchell & Henderson,* for plaintiffs in error.

*Alvin F. Pyeatt* and *Claude S. Arnold,* for defendants in error.

HARDY, J.   This proceeding is prosecuted to review a judgment of the district court of Garvin county denying dower to plaintiff in error Ellen Cook, and ordering a sale of the lands involved herein, and the proceeds to be distributed among the defendants in error.

The facts disclosed by the record are that one Sim Nelson, a duly enrolled member of the Choctaw Tribe of Indians, departed this life on May 5, 1903, intestate and

without issue, leaving surviving him Ellen Nelson, now Ellen Cook, plaintiff in error, his widow, and Cordelia Jacobs and Sibbie Childs, his sisters. At the time of his death the said Sim Nelson had not selected his allotment of the lands of the Choctaw and Chickasaw Nations. After his death plaintiff in error was appointed administratrix, and on February 2, 1904, selected in his name the lands to which he would have been entitled, being the lands on which he was the owner of the improvements at the time of his death, and upon which prior to and at the time of his death he resided with plaintiff in error. Subsequent to his death his sister, Sibbie Childs, died, and left surviving her certain children, some of whom, and the grantees of the others, began this action in the United States Court in the Indian Territory to apportion the lands so allotted in the name of said Sim Nelson. All of the parties other than the plaintiff in error agreed that the lands might be sold at public sale and the proceeds thereof apportioned among themselves according to their respective several interests. Plaintiff in error contended that she was entitled to one-half of said land as dower. The trial court rendered judgment directing the sale of the allotment and apportioning the proceeds to the heirs, and adjudged that plaintiff in error was not dowable of any part of said lands. It is here urged on behalf of plaintiff in error that she was entitled to dower under the statutes of Arkansas governing such matters, while defendants in error insist that by the provisions of Act Cong. July 1, 1902, c. 1362, 32 Stat. 641, known as the "Choctaw and Chickasaw Supplemental Agreement," they took title to the property to the exclusion of the widow, and this is the sole question presented here on this appeal.

By section 11 of said Supplemental Agreement it is provided:

"There shall be allotted to each member of the Choctaw and Chickasaw Tribes, as soon as practicable after the approval by the Secretary of the Interior of his enrollment as herein provided, land equal in value to three hundred and twenty acres of the average allotable land of the Choctaw and Chickasaw Nations.   *   *   *   "

Section 35 is as follows:

"No person whose name does not appear upon the rolls prepared as herein provided, shall be entitled to in any manner participate in the distribution of the common property of the Choctaw and Chickasaw Tribes, and those whose names appear thereon shall participate in the manner set forth in this agreement; provided, that no allotment of land or other tribal property shall be made to any person, or to the heirs of any person, whose name is on said rolls, and who died prior to the date of the final ratification of this agreement.   *   *   *   "

Section 22 is as follows:

"If any person whose name appears upon the rolls, prepared as herein provided, shall have died subsequent to the ratification of this agreement and before receiving his allotment of land, the lands to which such person would have been entitled if living shall be allotted in his name, and shall, together with his proportionate share of other tribal property, descend to his heirs according to the laws of descent and distribution as provided in chapter forty-nine of Mansfield's Digest of the Statutes of Arkansas; provided, that the allotment thus to be made shall be selected by a duly appointed administrator or executor."

By chapter 49, Mans. Dig., it is provided:

"Sec. 2522.   When any person shall die, having title to any real estate of inheritance, or personal estate (b),

not disposed of, nor otherwise limited by marriage settlement, and shall be intestate as to such estate, it shall descend and be distributed, in parcenary, to his kindred, male and female, subject to the payment of his debts and the widow's dower, in the following manner. * * * "

"Sec. 2540. The terms 'real estate,' as used in this act, shall be construed to include every estate, interest and right, legal and equitable, in lands, tenements and hereditaments, except such as are determined or extinguished by the death of the intestate, seised or possessed thereof in any manner, other than by lease for years and estate for life of another person.

"Sec. 2541. The term 'inheritance,' as used in this act, shall be understood to mean real estate, as herein defined, descended according to the provisions of this act."

By chapter 53, Mans. Dig., it is provided:

"Sec. 2571. A widow shall be endowed of the third part of all the lands whereof her husband was seised of an estate of inheritance (a) at any time during the marriage, unless the same shall have been relinquished in legal form."

"Sec. 2592. If a husband die, leaving a widow and no children, such widow shall be endowed of one-half of the real estate of which such husband died seised, (g) and one-half of the personal estate, absolutely and in her own right."

Defendants in error say that under the uniform holdings of the Supreme Court of the State of Arkansas, before the widow would be endowed of any part of the lands of her husband, he must at some time during marriage have been seised thereof, and they admit that seisin may exist in an equitable as well as a legal estate. This appears to have been the construction placed upon the statute by that court (*Blakeney v. Ferguson,* 20 Ark. 547; *Drenner v. Walker,* 21 Ark. 539; *Tate v. Jay,* 31 Ark. 576;

*Kirby v. Vantrece,* 26 Ark. 368; *Cockrill v. Armstrong,* 31 Ark. 580) ; and, taking this as a premise, they argue that Sim Nelson, having died before selecting his allotment or having received the same, died seised of no estate, legal or equitable, therein, and expressions to this effect are found in a line of decisions of which the following may serve as examples: *Sanders v. Sanders,* 28 Okla. 59, 117 Pac. 338; *Scott v. Jacobs et al.,* 40 Okla. 522, 140 Pac. 148; *Woodbury v. U. S.,* 95 C. C. A. 498, 170 Fed. 302; *Wallace v. Adams,* 143 Fed. 716, 74 C. C. A. 540; *McKee v. Henry,* 201 Fed. 74, 119 C. C. A. 412; *Stephens v. Cherokee Nation,* 174 U. S. 445, 19 Sup. Ct. 722, 43 L. Ed. 1041. And defendants in error therefore conclude that no right of dower exists in plaintiff in error. In the former opinion herein it was held by the court that, by reason of the fact that Sim Nelson died without selecting his allotment and without having been seised of any estate, legal or equitable, therein, it necessarily followed, applying strictly the provisions of chapter 49, Mans. Dig., to the conditions as they existed in the Indian Territory, that plaintiff in error was not entitled to dower in the lands of her deceased husband. Upon further consideration we are of opinion that this conclusion does not necessarily follow.

At this point a brief review of the conditions existing prior to the matters and things involved herein would, in our judgment, afford considerable aid in determining what was the intention of Congress and the tribes in entering into the Supplemental Agreement and what construction should be placed thereon by the court in order to carry that intention into effect.

The "Dawes Commission" had been created for the purpose of carrying out the general scheme of the federal

government relating to the allotment of tribal lands, and the distribution of other tribal property, and the final winding up of their tribal affairs, and in order to do this it was necessary to definitely ascertain the number of Indians entitled to participate in the distribution of the tribal property before the division could be made, and the Commission, in the prosecution of this work, had begun the preparation of a roll that was to show the number of members there were in the tribe, and the work of finally preparing and completing this roll was an undertaking of such vast proportions that its successful completion would involve a labor of years, and in the course of nature, while the work was in progress, it was inevitable that many of the members would die and others be born into the tribe, and it was necessary that some fixed and definite time should be adopted by which the rights of the individual members should be determined, and the rolls prepared with reference to this date, so that said rolls, when so completed, would show a complete list of all the members who were entitled to participate in the allotment and distribution. Even with this date definitely fixed, many of the persons whose names appeared thereon would die before making their selection, and in order that the death of such person might not disturb the general scheme, and to provide for the disposition of the share of those who might thus die, provision was made by section 22, *supra*, for this class, whereby it was provided that the lands to which such person would have been entitled should descend to his heirs according to chapter 49, Mans. Dig.

As already stated, much stress is laid on the fact in the briefs and oral argument of counsel that at the time of his death the allottee was vested with no actual seisin

of the property and had no inheritable interest or estate therein, but the effect of section 22 was to cause the provisions of chapter 49 to apply to and govern the devolution of the property when so selected by his administrator, in the same manner and with the same effect as if such property had been allotted in his lifetime and had descended to his heirs. A similar provision is contained in the Supplemental Treaty entered into between the Commission to the Five Civilized Tribes and the Creek Nation (Act June 30, 1902, c. 1323, 32 Stat. 501). By section 7 of said act it was provided:

"All children born to those citizens who are entitled to enrollment under [previous acts]" subsequent "to July 1, 1900, and up to and including May 25, 1901, and living upon the latter date, shall be placed on the rolls made by said Commission, and if any such child has died since May 25, 1901, or may hereafter die before receiving his allotment of lands and distributive share of the funds of the tribe, the lands and moneys to which he would be entitled, if living, shall descend to his heirs as herein provided and be allotted and distributed to them."

In construing this provision of the Creek Agreement, the Circuit Court of Appeals of the Eighth Circuit, in *Shulthis v. McDougal,* 95 C. C. A. 615, 170 Fed. 529, said:

"The phrase 'as herein provided' refers to chapter 49 of Mansfield's Digest of the Statutes of Arkansas, which deals with the subject of heirship and descent. The word 'descend' is, of course, inapplicable to the actual contingency provided for by the statute, because that contingency contemplates the death of the child before he had actually become seised of any interest in the land. The word 'descend' is a word of art, and indicates the transference of property by inheritance. If any significance is to be given to it as used in this section, it must be held that the intent of the parties to the agreement was that the land should pass to the same persons and in the same

proportions as it would have passed if the child had died seised of it. Any other construction simply obliterates this word, and makes the land pass to the parties who are heirs directly by allotment from the tribe. The statute itself not only declares that it shall 'descend,' but also declares that it shall be 'allotted and distributed' to the heirs. It is manifest, therefore, that both ideas were in the minds of the parties to the agreement. * * * It was never the intent, however, either of the tribe or of the federal government, to grant to parties having a kinsman who had died before the actual making of the allotment, additional lands as a bounty. These kinsmen got all their right to additional lands under and through the enrolled member who had died. Whether the ancestor was actually seised of the property or not in his lifetime was immaterial. It was the intent of the statute that the property should pass by the same right and in the same manner that it would have passed if the person enrolled had survived to receive his allotment. The tribe was not bestowing such land as a bounty, but was simply providing for the right of inheritance."

In *Barnett v. Way,* 29 Okla. 780, 119 Pac. 418, in the second paragraph of the syllabus, it is said:

"In determining who are the heirs of a deceased enrolled Creek Indian who, during her lifetime, received the allotment of the use and occupancy of an allotment, which, after her death, was ratified to her heirs by virtue of section 6 of the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. 861), the laws of descent and distribution of the Creek Nation are to be applied as if the deceased Indian had received title to her allotment during her lifetime, and died seised thereof."

In *Morley v. Fewel,* 32 Okla. 452, 122 Pac. 700, it is held, where an enrolled Creek woman died October 8, 1899, leaving a husband, a white man, and a legitimate daughter of the white man, and where the daughter died

December 19, 1899, unmarried and without issue, and an allotment was made to the heirs of the deceased Creek woman December 3, 1901, that by section 28 of the Original Creek Treaty (Act March 1, 1901, c. 676, 31 Stat. 869), the land descended as if the deceased had died seised after the Original Creek Treaty was ratified, leaving the same persons, related to her and to each other, in the same way, as at the actual time of her death.

Other decisions by this court supporting the proposition that, where an Indian died prior to receiving his allotment and the lands were afterwards allotted under provisions similar to section 22, the laws of descent and distribution in force at the time of the selection of said allotment were to be applied, and that the lands should descend in the same manner and to the same persons in the same proportion as it would have descended had the deceased selected same in his lifetime and died seised thereof, are as follows: *Sanders v. Sanders,* 28 Okla. 59, 117 Pac. 338; *Hooks v. Kennard,* 28 Okla. 457, 114 Pac. 744; *Brady v. Sizemore,* 33 Okla. 169, 124 Pac. 615; *Ground v. Dingman,* 33 Okla. 760, 127 Pac. 1078; *Shellenbarger v. Fewel,* 34 Okla. 79, 124 Pac. 617; *Reynolds v. Fewel,* 34 Okla. 113, 124 Pac. 623; *Woodward et al. v. De Graffenried,* 36 Okla. 81, 131 Pac. 162; *Scott v. Jacobs,* 40 Okla. 522, 140 Pac. 148; *McDougal v. McKay et al.,* 43 Okla. 251, 142 Pac. 987; *Warner et al. v. Grayson et al.,* 46 Okla. 622, 149 Pac. 235. See, also, *McKee v. Henry,* 119 C. C. A. 412, 201 Fed. 74. Of these the following cases have been appealed to the Supreme Court of the United States, and the decisions therein affirmed by that court: *Skelton v. Dill,* 235 U. S. 206, 35 Sup. Ct. 60, 59 L. Ed. 198; *Sizemore et al. v. Brady,* 235 U. S. 441, 35 Sup. Ct. 135, 59 L. Ed. 308; *Reynolds v. Fewel,* 236 U. S. 58, 35 Sup. Ct. 230,

59 L. Ed. 465; *McDougal v. McKay*, 237 U. S. 372, 35 Sup. Ct. 605, 59 L. Ed. 1001; *Woodward et al. v. De Graffenried*, 238 U. S. 284, 35 Sup. Ct. 764, 59 L. Ed. 1310.

Thus it is seen that the lands to which deceased would have been entitled, after having been selected in his name by the administrator, under the provisions of section 22, and of chapter 49, Mans. Dig., descend to his heirs in the same manner and in the same proportion that they would have descended had he selected the same in his lifetime and been seised thereof at the time of his death. But for these provisions the heirs themselves would have no right thereto by virtue of the fact that they stand in the relation of kinsmen to the deceased; and their rights to participate in the distribution of his share depend wholly upon these provisions and attach to the property at the time of the selection.

It is urged in the argument that because by the terms of section 22 it is provided that lands of a deceased Indian, when allotted in his name by an administrator, shall descend to his "heirs," the use of the word "heirs" means the lands shall descend to the "heirs," to the exclusion of the widow, and that because she was not named in section 22, the intention was manifest that she was not to be considered in the descent and distribution of these lands; but it will be noticed that this same section 22 says said property shall descend to the heirs "according to the laws of descent and distribution as provided by chapter 49, Mans. Dig. of the Stat. of Ark." Turning, then, to chapter 49, sec. 2522, we find that the provision is that:

"When any person shall die, having title to any real estate of inheritance, or personal estate, (b) not disposed of or otherwise limited by marriage settlement, and shall

die intestate as to such estate, it shall descend and be distributed, in parcenary, to his kindred, male and female, subject to the payment of his debts and the widow's dower, in the following manner. * * * "

It is true that Congress has made this chapter applicable to the conditions by reference thereto, and not by literally incorporating same into the Supplemental Treaty, but we can see no difference in the legal effect of the method by which the application is made. Had this chapter been literally incorporated in the Supplemental Treaty, including the language above quoted, we think it would not be seriously contended that the widow was not entitled to dower, and the mere fact of the act being made applicable by reference thereto makes no material difference.

Counsel further insist that no provision is made in chapter 49 for dower, and that chapter 53 was not adopted by virtue of the reference to dower in said chapter 49. If this were all of the legislation upon the subject, there might be some merit in this contention; but such is not the case. On May 2, 1890, Congress passed an act (Act May 2, 1890, c. 182, 26 Stat. 81), providing for a temporary government for Oklahoma Territory, and enlarging the jurisdiction of the United States Courts in the Indian Territory. By section 31 of this act certain general laws of Arkansas contained in Mansfield's Digest, including said **chapter 49 and chapter 53**, entitled "Dower," were adopted and extended over and put in force in the Indian Territory, where not locally inapplicable or in conflict with the provisions of said act or of any law of Congress relating to the subject mentioned therein. Act June 7, 1897, c. 3, 30 Stat. 83, contained a provision that on and after **January 1, 1898,** the United States courts

should have original and exclusive jurisdiction and authority to try and determine all civil cases in law and equity thereafter instituted, and on June 28, 1898, the President of the United States approved **an** act (Act June 28, 1898, c. 517, 30 Stat. 504) which, by section 26 thereof, provided:

"That on and after the passage of this act the laws of the various tribes or nations of Indians shall not be enforced at law or in equity by the courts of the United States in the Indian Territory."

By section 28 of the same act the tribal courts are abolished, but with the reservation in section 29 that has been construed as a restoration to these courts of a limited jurisdiction. The prohibition against the enforcement of tribal laws in the courts of the United States under the conditions mentioned was equivalent to a revocation or repeal of such laws and a declaration that they should not thereafter control in any matter to be adjudicated in the courts of the United States (*Helicker-Jarvis Seminole Co. v. Lincoln et al.*, 33 Okla. 425, 126 Pac. 723; *Johnson et al. v. Simpson*, 40 Okla. 413, 139 Pac. 129; *Armstrong v. Wood* [C. C.], 195 Fed. 137; Bledsoe, Indian Land Laws [2d Ed.] 265); and the special provision in section 22 of the Supplemental Agreement applying the provisions of chapter 49 to lands that might be allotted in the name of an ancestor was evidently inserted in said agreement in order to provide that such property should pass as other property. The provisions of chapter 53, Mans. Dig., entitled "Dower," giving a widow the right of dower in the lands of her deceased husband, of which he had been seised at any time during marriage, was extended to and put in force in the Indian Territory, by virtue of the legislation of Congress above referred to, and it has

been held that, where the husband died seised of lands, she would take dower therein (*Melton v. Lane*, 29 Okla. 383, 118 Pac. 141, Ann. Cas. 1913A, 628; *Burdett et al. v. Burdett et al.*, 26 Okla. 416, 109 Pac. 922, 35 L. R. A. [N. S.] 964; *Curry et al. v. McDaniel et al.*, 33 Okla. 19, 124 Pac. 319); and the right of a widow to dower in the allotment of her deceased husband who was an Indian citizen and who had selected an allotment in his lifetime was declared in *Hawkins v. Stevens*, 21 Okla. 849, 97 Pac. 567, and it has also been held that the right of the surviving husband to curtesy in the allotment of his deceased Indian wife, which existed in Arkansas by virtue of the common law, was also in force in the Indian Territory (*Armstrong v. Wood, supra; Johnson v. Simpson, supra*).

When we consider the legislation of Congress and its dealings with the tribes, in reference to the tribal property and affairs, we are forced to conclude that, when a definite time was fixed by which it was determined that all Indians living upon that date and whose enrollment should be finally approved were entitled to participate in the allotment of the tribal lands and other tribal property, it was not the intention of Congress to create any inequalities among the citizens whose names should thus appear upon the rolls, completed in accordance with this legislation, but that each one should participate in the same manner and to the same extent in the distribution of the tribal property. It was never intended that of two citizens duly enrolled, each of whom was entitled to share in the tribal property, where one had selected his allotment and died, his widow would be endowed in his lands, and the widow of the other who died before making his selection should be excluded, even though he died in point of time later than the one who, in fact, made his selec-

tion. The matter may be further illustrated by the case of an Indian citizen who married a noncitizen woman without complying with the tribal laws and customs, and whose wife was therefore not entitled to be placed upon said rolls, and did not receive an allotment, but by their joint industry they had accumulated funds and expended the earnings of a lifetime in the improvement of her husband's prospective allotment, but before filing thereon he died, although his enrollment had been finally approved, leaving no children born of the marriage. Can it be said that it was the intention of Congress and of the tribes that the widow should be deprived of the homestead and shorn of any dower in her husband's lands, and possession thereof taken from her and delivered to her husband's relatives, who perhaps were no closer related than cousins? The illustration is not extreme, and serves to show the results that would necessarily follow the construction contended for by defendants in error. To our minds it is clear that it was the intention of Congress and of the tribes to provide that the property of the class mentioned in section 22 should be governed by the same law and descend in the same manner to the same persons, and in the same proportion as other tribal property of like character would descend, and by these provisions to obviate the necessity of actual seisin, creating, as it were, a seisin by operation of law, and that the purpose and intention of incorporating said section 22 in the act was to remove from the realm of doubt and make certain the intention that property of this class should descend under the provisions of chapter 49, whereas it might have been doubtful and the cause of some speculation as to how it should descend had this provision not been incorporated therein.

Entertaining these views of the case, and construing these various provisions as we do, there is no escape from the conclusion that the lands herein descended to the heirs, subject to the widow's right of dower therein; and the judgment is reversed and remanded, with instructions to set aside dower to the plaintiff in error.

All the Justices concur.